# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

FORT OSAGE R-I SCHOOL DISTRICT,    )
   )
       Plaintiff,    )
   )
       v.    )    Case No. 09-563-CV-W-FJG
   )
NICHOLE and BRANDON SIMS, by and    )
on behalf of their daughter, B.S., a minor,    )
   )
       Defendants.    )

## ORDER

Currently pending before the Court is the District's Motion for Judgment on the

Administrative Record or in the Alternative for Summary Judgment on Plaintiff's

Complaint (Doc. # 19); District's Motion for Judgment on the Administrative Record or in

the Alternative for Summary Judgment on the Sims' Counterclaim Complaint (Doc. #

21) and the Sims' Motion for Judgment on the Administrative Record (Doc. # 24).

## I. BACKGROUND[1]

### A.  Health History/Development of Individualized Education Plans ("IEPs")

---

[1] The Administrative Record in this case is quite extensive, comprising twenty-nine volumes which include the transcripts of the twenty-nine day administrative hearing, numerous volumes of exhibits as well as the 227 page decision of the Hearing Panel along with their factual findings and the dissenting opinion of one of the panel members.  As a result of the sizeable record, much of the text contained in the Court's Factual Background is taken directly form the administrative panel's Findings of Fact, as well as the parties' motions without citation.  Recognizing that the Court is required to make an independent determination of the issues using a preponderance of the evidence standard, giving "due weight" to agency decisionmaking, the Court states that in quoting without citation, it has reviewed the record and independently determined those facts to be true by a preponderance of the evidence.  See CJN v. Minneapolis Public Schools, 323 F.3d 630,636 (8th Cir.), cert. denied, 540 U.S. 984, 124 S.Ct. 478, 157 L.Ed.2d 375 (2003).

At birth, Student was diagnosed with Down's syndrome. On October 23, 1996, Student's hearing was evaluated and she was diagnosed with a severe to profound hearing loss in her right ear and borderline normal hearing in her left ear. From birth until age 3, Student received early intervention services through the Missouri First Steps program, special instruction from the Sunshine Center, private speech therapy and occupational and physical therapy. In 1999, while student was receiving these services, no professional indicated that she might have autism. On June 15, 1999, the District prepared an evaluation report to document the Student's initial evaluation and eligibility under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 140 et seq. After reviewing the report, a multidisciplinary team, that included Mother, concluded that the Student met the criteria for early childhood special education based on multiple delays including cognition. Nothing in this initial evaluation report indicated that student might have autism.

**Initial IEP - June 20, 1999**

On June 20, 1999, the District developed an initial IEP for Student. (R-2).[2] Mother and the speech therapist, Ms. Knight, participated in the development of the IEP. The June 1999 IEP included goals in language, speech, occupational and physical therapy and basic concepts. The IEP offered student special education services in the District's early childhood special education program as well as speech/ language, occupational and physical therapy. During the 1999-2000 school year, the Student made slow progress toward her occupational therapy goals.

---

[2] The exhibit numbers referred to were the District's exhibits that were used during the Administrative Hearing.

**May 11, 2000 IEP**

On May 11, 2000, the IEP team convened to prepare Student's annual IEP for the 2000-2001 school year. (R-3). Mother and Ms. Knight were among the participants. The May 11, 2000, IEP contained goals in basic concepts, rote counting, expressive and receptive language, speech, fine motor and gross motor skills and continued to offer the Student 510 minutes per week of early childhood special education with speech, language, occupational and physical therapies. On November 10, 2000, the IEP team convened to review and revise the IEP. (R-3). Parents and Ms. Knight participated in this meeting. The parents were concerned about the Student's speech and language skills and her difficulty in interacting with her peers. The team noted that the Student continued to make progress on her IEP goals. Based on the parents concerns, the team added 60 minutes per week of itinerant services to the already existing services. Subsequent to this meeting, the District provided the parents with written progress reports to show the Student's progress. These reports show that the Student progressed on many of her goals and even mastered some.

**November 2, 2001 IEP**

The Student IEP team again convened to revise the Student's IEP. (R-4). Parents and Ms. Knight participated. The present level of the IEP noted progress in all areas. The IEP team developed goals in receptive and expressive language, speech and articulation, cognition and occupational and physical therapy. In the cognition area, the team proposed to increase the Student's communication abilities through the use of

words, signing or a communication systems, such PECs[3] or another augmentative communication system. The IEP does not indicate that the parents expressed any concerns related to Student's behavior, the need for an assistive communication device or the possibility that the Student has autism.  The IEP offered the Student 450 minutes per week of early childhood special education, 60 minutes per week of itinerant instruction and the related services of occupational, physical, speech/ language therapies.  The District provided the parents with written progress reports.  The reports indicated that the Student was making progress with regard to her goals.  From November 2001 to May 2002, Student mastered many of her physical therapy goals.

### Spring 2002 IEP

On March 14, 2002, the IEP team conducted a review of the existing data and prepared a reevaluation plan in preparation for student's transition to Kindergarten.  The team also discussed the need for extended school year services and determined that the Student required such services in the areas of speech and language.  On April 25, 2002, the District provided the Parents with a written notice proposing to change Student's IDEA diagnosis from Early Childhood Special Education to Mental Retardation.  On May 13, 2002, the IEP team met to revise the IEP. (R-4). The present level noted that student's educational diagnosis was mental retardation and that Student would attend Buckner Elementary School during the upcoming 2002-2003 school year.  Mother is also a teacher at this elementary school.  The IEP included goals in the areas of math, reading, communication, speech/language, gross and fine motor skills.  The

---

[3]PECs is a picture exchange system of communication.

4

language goal reflected the use of the PECS system and listed this as an accommodation. Additional accommodations included an enlarged computer cursor, a touch screen on the computer, a visual schedule, and paraprofessional or adult supervision at lunch, recess, assemblies and in the general education classroom. The IEP offered Student 715 minutes per week of specialized instruction in pre-academics and adaptive music with related therapies of speech/ language, occupational and physical therapies and adaptive physical education. Ms. Emery, Student's special education teacher from 2002-2006, testified that the placement was appropriate and that she and the parents agreed with the placement. When Student entered Ms. Emery's class in August 2002, she had no verbal communication and no sign communication. Mother did not want Ms. Emery to use sign language, because she feared it would be a crutch and student would not develop her spoken language. In August 2002, Student had no problem behaviors, but was distractible. During the 2002-2003 school year, Student made progress on her IEP goals. The District also implemented a communication board and/or picture exchange system. During this time, Ms. Emery felt that Student was progressing.

### March 2003 IEP

On March 10, 2003, the team met to revise Student's IEP. (R-5). The parents and Student's private speech therapist attended this meeting, as well as several individuals from the District. The present level noted that student had progressed in pre-academics, had made significant progress in speech and language and had met all of her communication goals. The IEP added additional accommodations including preferential seating and the use of an FM amplification system. The March 2003 IEP

provided student with 885 minutes of specialized instruction in pre-academics, as well as speech/language, occupational and physical therapies. The March 2003 IEP also offered Student 1500 minutes per week of extended school year services for one month.  However, student only attended for a portion of this time.  All members of the team agreed that student would best be served during the 2003-2004 school year by remaining in a kindergarten classroom.  During the 2003-2004 school year, Student again attended Buckner Elementary with Ms. Emery as her teacher.

**March 2004 IEP**

On March 10, 2004, the team met to revise Student's IEP. (R-6). The parents, their private speech therapist, Ms. Knight, as well as several others from the District attended the meeting.  The March 2004 IEP included some goals which were new, which demonstrated the progress that the Student had made. The parents did not express any concerns at this time.  The IEP provided that Student was to receive special education 60% of the time and to receive speech/language, occupational and physical therapies.  The March 2004 IEP also recommended that Student receive extended school year services for one month.  The notes from the meeting indicated that it was recommended that Student's physical therapy time be reduced due to the progress that Student had made in her gross motor skills.  The use of a PECs communication system was also discussed.  The parents agreed to allow this system to be initiated, as long as all aspects of speech were included.  The meeting notes did not reflect any parental concerns.  During the summer of 2004, Student only attended three of the 5-6 offered extended school year services for the proposed occupational therapy. During the 2004-2005 school year, Student continued to attend Buckner Elementary, as

6

a first grade student. At the parent's request, student was allowed to stay in Ms. Emery's classroom for four years. On October 27, 2004, Ms. Emery met with Parents for a parent-teacher conference. Parents also spoke with Ms. Geringer about Student's speech therapy. On November 4, 2004, Brenda Williams the process coordinator for the District, initiated the process for student's required three year evaluation. On December 6, 2004, the District began preparing for the Student's three year evaluation. The parents, as well as others from the District participated in this meeting. The progress reports showed that Student was making progress on her IEP goals and was playing with her peers. However, Student's parents and teachers did note some changes had occurred in Student's behaviors over the last 2-3 months. The District at this time wanted to administer a test to assess the Student's IQ. However, the parents were opposed because they believed that if the Student scored too low, that she would be moved from Ms. Emery's classroom to a different elementary school. No one at this meeting suggested that the Student might have autism. Mother also testified that she was not seeking to have the District assess to determine if student had autism at this point. At this meeting, the parents expressed concerns to the team that things were not working and the computers that had been promised were also not working. At this time, because the parents felt that they were losing trust in the District, they obtained a parental advocate, Rand Hodgson, to assist them. During January and February 2005, parents obtained several outside evaluations of Student. The parents shared these evaluations with the members of the IEP team and these results were considered and incorporated into the District's evaluation reports. On January 25, 2005, when Student was eight years old, Parents took her to psychologist Jamie Prestage, for a

psychological assessment.  Ms. Prestage did not seek the input of school personnel, nor did she observe the student in a school setting.  Ms. Prestage sought only the input of the Parents and administered a Childhood Autism Rating Scale ("CARS") with Student's parents serving as the informants.  Based on this, Ms. Prestage stated that Student met the diagnostic criteria for autism.  Ms. Emery and Becky Hughes, from the District testified that the CARS was not a diagnostic tool and that it is a very subjective tool.  The parents provided the District with the outside autism and occupational therapy assessments.

### March 2005 IEP

On March 4, 2005, the District convened the student's IEP team to discuss the reevaluation and the various outside evaluations obtained by the Parents.  The Mother, the private speech therapist and the parental advocate, Mr. Hodgson, attended as well as personnel from the District.  The evaluation report that was prepared reflected the results of the previous reviews of existing data, the new assessments the District administered as well as the outside evaluations provided by the Parents. Due to the diagnosis of autism, and at the Parents' and Mr. Hodgson's request, the IEP Team decided to acquire additional information to determine if Student met the criteria for autism or other disabling conditions.  On March 9, 2005, the IEP team met to conduct the annual IEP review. (R-24). The parents did not attend this meeting.  This is the only meeting which the parents did not attend.  The IEP discussed the student's present level of performance.  The IEP also included numerous accommodations and modifications including adaptive art, music and computer and a visual schedule and supports.  The March 2005 IEP included goals and objectives in reading, math,

8

activities of daily living, language, pragmatic language, speech articulation, safety awareness, recreation and leisure and fine motor skills. The March 2005 IEP provided that student would receive special education services more than 60% of the time and would also receive speech/language and occupational therapies. Student would be integrated with her non-disabled peers during lunch, recess and other activities. The Parents received a copy of the completed IEP. During the hearing, the Mother testified that the IEP did not adequately address all of the Student's needs, but when asked to describe those, she could not specify what they were. Mother testified that she did not believe that the Student was receiving enough 1:1 speech language time. However, during her testimony, she conceded that any requests she made were verbal and were not in writing. Additionally, although she felt that the 60 minutes per week or occupational therapy was not enough, Mother conceded that she never expressed any disagreement with the amount of therapy to the District. On March 23, 2005, the District conducted a new review of existing data based on the Parent's request for additional reevaluation. The team determined that additional information was needed, including whether Student had autism. The District proposed an observation of Student by a contracted autism consultant. The consultant determined that the District should conduct a cognitive assessment and develop a communication system for the Student.

**May 2005 IEP**

On May 5, 2005, the IEP team met to review the results of the additional reevaluations. The Father attended the meeting as well as two consultants hired by the parents and the Student's private speech tutor. After reviewing the results, the team agreed that the Student met the state criteria for Other Health Impaired (based on

medical diagnoses of Down's Syndrome and autism) and Speech/Sound Disorder.  The

change in diagnosis did not have any impact on the services or goals of Student's

subsequent IEP.  On May 16 and 24, 2005, Student's IEP team convened to review and

revise her IEP. (R-37).  The Parents' primary concern at this time was communication

and the Parents agreed to begin the process of looking into an augmentative

communication device.  The team also agreed to document Student's therapy times in

the communication log and to provide Parents with daily communication.  The Parents

requested a individual paraprofessional to work with Student, but the team agreed to

provide paraprofessional support only when the Student was outside her special

education classroom.  Individual instruction was also going to be implemented to

support Student's continued academic progress.  The IEP provided for Student to

receive 1065 minutes per week of specialized instruction in academics, 90 minutes per

week of speech therapy and 60 minutes per week of both language and occupational

therapy.  The IEP also provided that Student would receive 750 minutes per week of

regular education.  The May 2005 IEP included accommodations and modifications

such as sensory rich experiences, extended time to process information, positive

reinforcements, individual low sensory instruction and a daily communication log.  The

IEP also included the use of an adaptive keyboard.  The May 2005 IEP included goals

in the areas of daily living, math, reading, fine-motor skills, language and speech.  Many

of the goals/objectives were new for Student and many of the wording changes were

done at the request of Mr. Hodgson.  Some of the changes were due to the Student's

progress.  The District implemented the IEP and prepared progress reports.  The

progress reports showed that the Student was making progress and that District had

data which supported this. The District determined that the Student was eligible for extended school year services in the areas of speech, language and occupational therapy. During the summer of 2005, Parents had Student's hearing evaluated. It was determined that Student had a newly identified hearing loss in her right ear and normal hearing in her left ear.

### 2005 - 2006 School Year

Student attended Buckner Elementary as a second grader during the 2005 - 2006 school year. Ms. Emery continued as Student's special education teacher. Mother notified Ms. Emery of the newly diagnosed hearing loss. The District then also pursued an audiological exam and the audiologist participated in the IEP meetings. The District also obtained an FM system to assist Student with hearing. At some point during the 2005- 2006 school year, Ms. Emery became aware that Student needed something for communication outside of the special education classroom. During the 2005-2006 school year, Ms. Emery felt that the Student had more behaviors than in the previous years and was becoming more obstinate.

On October 18, 2005, the IEP meet to review and revise Student's IEP. (R-44). The Mother, district personnel, the private speech therapist and Mr. Hodgson were present. Due to the recently diagnosed hearing loss, the IEP was changed to include the addition of an FM amplification system. The October IEP provided 1150 minutes per week in special education, 150 minutes total per week of speech/language therapy. The October IEP did not include the use of an electronic augmentative communication device. When the team met in October 2005, Ms. Emery had documented two more severe behaviors. When Student had a severe behavior, Ms. Emery informed the

Parents.  She did not believe that a behavior intervention plan was necessary at that point.  The District collected data regarding Student's progress on her IEP and it showed that the Student was making progress on her goals and objectives.

On February 10, 2006, the IEP team met at the Parents' request to discuss an augmentative communication device and the increase in the number of student's behaviors.  The Parents, District personnel, the parents' two consultants and the parental advocate, Mr. Hodgson attended the meeting.  The team discussed the adaptive keyboard and the possibility of a new computer to run the program.  The team agreed that an assistive technology evaluation should be conducted.  Due to the increased behaviors, Parents requested that a Functional Behavioral Assessment be conducted.  The team decided to amend the IEP to state that the Student was now displaying behaviors that impeded her learning and to add a personal paraprofessional as a new service.  Ms. Emery did not believe that a formal behavior plan was necessary to deal with Student's behaviors and that it was part of the Student's normal developmental process.  On February 22, 2006, Student went to the Rehab Institute to participate in an assistive technology evaluation.  The Institute informed the District that the Student's name had been placed on a waiting list for a trial period with the "Mighty Mo" communication device.  On March 28, 2006, Becky Hughes, the District's autism/behavioral consultant and special education teacher for the District, observed Student at school to conduct the functional behavioral assessment.  Based on her observations of the Student and her review of Student's records, Ms. Hughes testified that she did not believe that Student met the Missouri IDEA criteria for autism.  When she was observing Student, Ms. Hughes did not witness any significant behaviors.

However, she did assist the IEP team in developing a behavior intervention plan that was finalized in May 2006.

On April 11, 2006, Ms. Emery attempted to utilize an informal plan requested by the parents when Student engaged in a behavior. Ms. Emery took Student to the recovery room when she refused to cooperate. Mother also went to the Recovery Room, but had no success. The Student's Father was then called to assist. The Parents then choose not to take Student home, as specified in the Plan, because they had a meeting to attend and the Student was scheduled to go to her Grandparent's house. Ms. Emery did not agree with the Parent's lack of follow through regarding the Plan, however she did not choose to share this opinion with the Parents because she did not want to offend them.

### April 2006 IEP

On April 19, 2006, the IEP team met to review and revise the IEP. The parents participated as well as various District personnel. At this time the IEP still did not include the use of an augmentative communication device. The District was attempting to obtain a loaner communication device to see if it was appropriate for Student's use. On May 4, 2006, the IEP team met in an effort to finalize the IEP. Mother attended, as well as Mr. Hodgson and various District personnel. The Behavior Plan was finalized and put into place. After the May 2006 meeting, Ms. Emery began implementing the behavior plan. However, after it was implemented, Student exhibited no additional behaviors for the remainder of the school year.

On May 9, 2006, the District received the loaner augmentative communication device. However, Ms. Emery found that the device was heavy and difficult for the

Student to carry.  During this time, Ms. Emery and the paraprofessional were using a necklace that Ms. Emery had made for the student, that has pictures of student in various settings.  The Student was able to use the necklace to communicate her wants and needs.  On May 12, 2006, the Parents sent the District a list of requests and clarifications regarding the Student's IEP.  This letter was in conjunction with the ongoing development of the IEP.

On May 17, 2006, Parents sent a letter to the District's superintendent stating that they did not feel that Student was receiving a free appropriate public education. Parents stated that they were "hereby giving you our ten day notice that we will be withdrawing Student and placing her in a more appropriate educational setting."  In addition, they informed the District that they may be seeking District reimbursement. Mother testified at the hearing that she was concerned that during the upcoming 2006-2007 school year, Student would be shifted to Ms. Malotte's classroom, and Mother did not want the Student moved.  Father testified that prior to placing Student at Rainbow, they did not ask the District to place her there.  Their intention was to have the Student attend the Rainbow Center over the summer and try it out.  On May 17, 2006, the District contacted the Parents and requested times to meet in order to finalize the IEP.

On June 13, 2006, the Student's IEP was finalized. (R-58). The Father, Mr. Hodgson and various District Personnel participated.  The June 2006 IEP offered Student 1490 minutes of specialized instruction in academics, 150 minutes of speech/language therapy, 60 minutes per week of occupational therapy and 325 minutes per week in regular education.  The IEP provided for a District placement, although a specific location had not been selected.   The Parents did not request a

14

private placement or a placement at the Rainbow Center during the meeting. The IEP noted that the Student was to be mainstreamed for lunch, recess, music, physical education, field trips and assemblies and she had paraprofessional support for these activities. The IEP also provided for an auditory trainer and the trial use of an augmentative communication device. The IEP noted that Student had continued to make consistent progress in meeting her goals. In the area of communication, the present level noted that Student had mastered nearly all the goals in that area. The Parent section indicated that the Parents wanted to implement a communication device. Ms. Emery testified that at the conclusion of the process, the Parents and Mr. Hodgson were active participants and no one was in disagreement with the IEP. The IEP offered numerous accommodations including sensory rich experiences, use of an adaptive keyboard, a daily communication log, an FM system, priming and for the first time an augmentative communication device. The June IEP included goals in activities of daily living, behavior, math, reading, fine-motor skills, writing, functional communication, receptive, expressive and pragmatic language. At the conclusion of the process, Parents and Mr. Hodgson did not express any disagreement with the goals or objectives. Mother however testified that the Parents' concerns were not adequately addressed in the IEP. The June IEP also included the behavior plan that was developed in May. At this meeting, the Parents and their advocate did not request that the District place the Student at Rainbow and Parents did not inform the team that they were considering placing the Student at Rainbow. On June 15, 2006, the District provided the Parents with a Notice of Action refusing the Parents' request to change the IEP accommodations and modifications page from "close proximity to instruction" to

"one-on-one instruction." This was the first notice of action, where the District refused a parental request, during the four years that the Student attended school. The Student did not attend school anywhere in the District after May 25, 2006. The District was never given the opportunity to implement the IEP that was developed in April/May/June 2006. After the summer of 2006 and before August 2006, Parent did not return to the District and ask to change Student's placement to Rainbow.

### June 2006 - Rainbow Center

On June 27, 2006, the Parents placed the Student at the Rainbow Center. During the 2006-2007 and 2007-2008 school years, Student attended the Rainbow Center. The Executive Director of the Rainbow Center testified that it is a private day school for students with severe disabilities. All of the children who attend the Center are disabled, although they do occasionally have an opportunity to interact with nondisabled individuals in the community. The Parents testified that Student made meaningful progress while at Rainbow and had a positive attitude toward attending school.

### August 2006

On August 30, 2006, the Rainbow Center developed an IEP for Student. Both Mother and Mr. Hodgson attended. The August 30, 2006 IEP provided the Student with 1680 minutes of specialized instruction, with 60 minutes of speech/language therapy and 60 minutes per week of occupational therapy. The IEP also included certain accommodations and modifications including preferential seating and a sensory program. The IEP did not provide for the use of an augmentative communication device or for an extended school year.

### November 2006

On November 15, 2006, the Parents corresponded with the District and asked to schedule an IEP meeting to discuss Student's progress. Because the Student was not currently enrolled in the District, the District informed the Parents that an IEP meeting could not be conducted. However, the District offered to meet with the Parents and once Student was enrolled to schedule an IEP meeting.

### January 2007

On January 4, 2007, Parents enrolled Student at Buckner Elementary. The Parents informed the school that the Student would stay at Rainbow until an IEP was developed for her. On January 10, 2007, the District held an IEP meeting. Father and Mr. Hodgson attended as well as several District personnel. The team reviewed the IEP from Rainbow, but decided that they needed additional information before they could draft an IEP. It was also discussed whether a placement at Elm Grove Elementary had been previously considered. The District made efforts to obtain records from Rainbow and even scheduled a telephone conference to discuss the Student's progress.

### February 2007

On February 5, 2007, the District held an IEP meeting for Student. Mother attended, as well as Mr. Hodgson, and the private speech tutor and various District personnel. During this meeting, Parents did not request that the District either place the Student at Rainbow or pay for Rainbow. Dr. Smith, who was the Process Coordinator for the District, believed that the Parents were seeking an IEP that placed Student in the District. In February 2007, the District sent Parents a draft IEP. The Parents responded

with a letter indicating their concerns.  In mid-February, the team met again in an attempt to finalize the IEP.  At the conclusion of the meeting, Mr. Hodgson stated that the Parents were open to placement, but would request Rainbow.  In late February, Dr. Smith contacted Parents about visiting Fire Prairie Middle School.

### April 2007

On April 2, 2007, the IEP met to finalize Student's IEP. (R-86). The parents attended as well as Mr. Hodgson, and the private speech therapist and several District personnel.  The District agreed to purchase a Tango augmentative communication device and train staff in its use, conduct a room assessment regarding sensory issues, hire a 1:1 paraprofessional, check to see on the need for a touch screen, obtain an FM system, and obtain an Itellekeys keyboard.  The Student would received 1490 minutes of specialized instruction in academics, 150 minutes in speech/language and 60 minutes per week of occupational therapy. These services were to be provided at Fire Prairie Middle School.  The IEP also included a behavior intervention plan.  Dr. Smith testified that the IEP team had considered placement at Rainbow, but that in comparing the Rainbow IEP with the District's April 2007 IEP, there did not seem to be a great deal of difference.  The Parents indicated that they would contact Dr. Smith that afternoon with their decision.

On April 3, 2007, Mother contacted Dr. Smith with questions regarding Fire Prairie Middle School.  Specifically, she asked if the Parents could be involved in the hiring of the classroom paraprofessional.  Dr. Smith sent a letter to parents the same date, enclosing a notice of action refusing the requested placement at Rainbow because it was not the Student's least restrictive environment.  The Parents then sent a

letter to Dr. Smith stating that it would take at least four weeks for the District to have all the accommodations in place and suggesting that it would be best to have Student remain at Rainbow for the last few weeks of school and for the extended school year and asking if the District would pay for that and develop a transition plan for Student. Dr. Smith responded that parents were not allowed to be involved in hiring decisions, she also stated that the Student could begin at Fire Prairie whenever the Parents wished and noted that the Parents had not raised the transition issue at the IEP meeting. She also informed the Parents that the District would not pay for Rainbow for the remainder of the school year or for the summer. On April 10, 2007, the District's Board of Education approved the purchase of a Tango communication device for the Student at a cost or $6,924.00. In mid-April, Dr. Smith telephoned the Parents to see if they had made a decision. Father returned the call and indicated that they had not made a decision. After April 16, 2007, Dr. Smith never received any communication from the Parents stating whether Student would return to the District.

**B. IDEA Due Process Proceeding**

On April 24, 2007, Parents initiated a IDEA Due Process proceeding by writing to the Missouri Department of Elementary and Secondary Education. Parents stated that they did not believe that Student was receiving a free appropriate public education from the District and they were willing to mediate. In that request, Parents stated that they were looking for a private placement and seeking reimbursement. During the 2007-2008 school year, Student continued to attend at the Rainbow Center and did not return to the District.

The Administrative Hearing in this case began on November 27, 2007 and the

panel heard testimony from fourteen witnesses over a twenty-nine day period,

eventually concluding on September 18, 2008.  On June 18, 2009, the Panel issued its

decision.

### C. Administrative Panel's Decision

The Panel made the following determinations with regard to the June 13, 2006

IEP.[4]

**1.  Procedural Compliance** - By a 2-1 vote, the Panel found that the Parents

were denied the right to meaningfully participate in the development of the Student's

June 13, 2006 IEP.  The Panel found that this was a result of 1) Ms. Emery withholding

information from Parents which constituted a disservice to the IEP team and to the

Parents; 2) Ms. Terrill, (a regular education teacher) advising Father that she was

restricted by the District in what she could say; 3) the abrupt silencing at the May 26,

2006 IEP meeting by Ms. Emery who testified that Brenda Williams might have touched

her under the table in an attempt to silence her; and 4) Ms. Mulford's failure to disclose

that she did not believe that the program being provided to the Student was appropriate.

The District found that these circumstances all resulted in "significant impediments to

Parents' opportunity to meaningfully participate in the decision-making process

regarding the provision of a FAPE ["Free Appropriate Public Education"] for Student"

(Panel Decision, p. 205).  The Panel noted that the parents had "extensive input into

virtually all (they missed only one IEP meeting) of their daughter's IEPs, including the

---

[4] The Panel focused on the June 13, 2006 IEP because the timeline began to run on April 24, 2005.  There was an IEP formulated on May 24, 2005 and two addendums, but it was the June 2006 IEP that was in place when the Parents placed the Student at Rainbow.

June 13, 2006 IEP.  Not only did the parents actively participate, but those that they invited, including their experts and advocate, also actively participated, and often, as a result of that participation, numerous components of the IEPs including present level of performance, goals and objectives, modifications and adaptations were changed.  The District spent an inordinate amount of time and manpower to accommodate Parents and their representatives' positions and in the development of Student's IEPs. . . . In addition, the District expended considerable resources in preparing for the IEPs and for testing that was considered in developing Student's IEPs.  The number of meetings and hours devoted by District's staff to Student is overwhelming."  (Panel Decision, p. 205-06). The Panel however concluded that parental participation must be based on "complete candor" and parental participation is "tainted, if not fully compromised, if parents do not know the thoughts and opinions of key members of the IEP team." (Panel Decision, p. 206).  The Panel determined that in this case, it was the lack of candor and the suppression of thought by members of the IEP team that constituted the denial of meaningful and effective parental participation resulting in the denial of a FAPE from the beginning of the 2006-2007 school year until April 2, 2007.

### 2. Substantive Compliance

The panel determined that having found that there was a procedural violation, it was not necessary to rule on whether there was substantive compliance.  However, the majority of the panel decided that it was advisable (although not needed) to indicate their rulings on whether there was substantive compliance of the June 13, 2006 IEP. Panel Member Davis concluded that there was not substantive compliance because he did not feel that the Student received any educational benefits during the 2005-2006

school year and the data used to support Student's success was tainted. However, Chairperson Ulrich concluded that if the IEP of June 13, 2006 was procedurally valid, then there was substantive compliance based upon the same reasons presented by Panel Member Allee. So, a separate 2-1 majority of the Panel determined that the June 13, 2006 IEP was substantively compliant.

### 3. Educational Diagnosis

The Panel noted that while their ruling on the procedural violation issue rendered the issue of the Student's educational diagnosis moot, the Panel choose to address it anyway because considerable testimony had been presented and the issue was hotly contested. The Panel did not make an educational diagnosis but found that whether the diagnosis was other health impaired, autism or mental retardation, made no difference, because it was the Student's needs, not the label which determined what special education services were to be provided. Thus, the Panel found that the question was whether the District had developed an IEP that addressed the Student's condition(s) and needs.

### 4. Rainbow Center & Reimbursement

Since the Panel determined that the Student's June 13, 2006 IEP was not adequate, the Panel considered whether the Rainbow Center was an appropriate placement. The Panel found that Rainbow was an appropriate placement and the Parents gave appropriate notice to the District before placing her at Rainbow. Therefore, the Panel held that the District should reimburse the Parents for the cost of tuition at Rainbow for the 2006-2007 school year, not to exceed $2,200 per month.

**5. April 2, 2007 IEP**

The Panel concluded that the April 2, 2007 IEP was appropriate and would have provided a FAPE to the Student because there was no indications of failure to disclose or suppression any thoughts/opinions with regard to this IEP.

## II.  STANDARD OF REVIEW

### A. Judgment on the Pleadings

Fed.R.Civ.P. 12(c) sets the standard for reviewing a motion for judgment on the pleadings.  A defense of failure to state a claim may be raised in [a motion for judgment on the pleadings] and the same standard is employed as if the motion were brought under Rule 12(b)(6). . . . A Rule 12(c) motion for judgment on the pleadings challenges the legal sufficiency of the opposing party's pleadings. . . .Under the relevant standard, the Court must accept as true all well-pleaded factual allegations contained in the [Complaint]. . . . However, the Court is not required to give any effect to conclusory allegations of law. . . . Judgment on the pleadings is appropriate if, assuming the truth of all material facts pled in the complaint, the moving party is nonetheless entitled to judgment as a matter of law.

Lathrop R-II School Dist. v. Gray, No. 08-6040-CV-SJ-GAF, 2009 WL 2982645, *7 (W.D.Mo. Sept. 11, 2009), aff'd, 611 F.3d 419 (8th Cir. 2010)(internal citations and quotations omitted).

### B.  Standard for Review of Panel's Decision

Under 20 U.S.C. § 1415(i)(2)(B), a court reviewing an appeal of an IDEA claim must (i) "receive the records of the administrative proceedings"; (ii) "hear additional evidence at the request of a party"; and (iii) "grant such relief as the court determines is appropriate," basing its decision on the preponderance of the evidence.  While a court reviewing a decision from an administrative panel should give due weight to the results of the due process proceedings under the IDEA, it must nevertheless make an independent determination based on a preponderance of the evidence.  See Bd. Of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); see also D.B. v. Ocean Tp. Bd. of Educ., 985 F.Supp. 457,500 (D.N.J.1997),

aff'd 159 F.3d 1350 (3d Cir. 1998). The "amount of deference to be afforded the administrative proceedings is an issue left to the discretion of the district court . . . [T]he district court must consider the administrative findings of fact, but is free to accept or reject them." Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1219 (3rd Cir. 1993)(quoting Jefferson City Bd. of Educ. v. Breen, 853 F.2d 853, 857 (11th Cir. 1988))(quotations omitted). Under the IDEA, a reviewing court should ordinarily defer to record-supported credibility determinations of hearing panel members, but should exercise plenary review on all other matters, such as inferences from proven facts, conclusions of law, and credibility-based findings that are not adequately supported in the record. Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527 (3rd Cir.1995); see also D.B., 985 F.Supp. at 500.

Lathrop R-II Sch. Dist., 2009 WL 2982645 at *7.

## III. DISCUSSION

### A. IDEA Statute

The IDEA is designed "to insure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." IDEA § 1400(d)(1)(A); Honig v. Doe, 484 U.S. 305, 308, 108 S.Ct. 592, 98 L.Ed. 2d 686 (1988).

A FAPE means that special education and related services have been provided, that they conform to applicable state standards, that they include an appropriate school, and that they are provided in conformity with the IEP required by § 1414(d). See 20 U.S.C. § 1401(a)(8)(A)-(D). The Eighth Circuit has stated the following in regard to whether a child has received a FAPE: A child receives a free appropriate public education if he receives personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. . . .The IDEA requires that public school districts offer eligible children instruction and supportive services reasonably calculated to provide *some educational benefit*. . . . The statute also requires that students with disabilities be educated in the least restrictive environment, 20 U.S.C. § 1412(a)(5)(A), reflecting a strong preference that disabled children attend regular classes with non-disabled children and a presumption in favor of placement in the public schools. . . . [C]hildren who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day . . ..

<u>J.L. v. Francis Howell R-3 Sch. Dist.</u>, 693 F.Supp.2d 1009, 1012-13 (E.D.Mo. 2010)(internal citations and quotations omitted).

### B. Two-Part Test

The IDEA's legal obligations are fulfilled when the school district (1) complies with the law's procedures in developing an IEP, and (2) the resulting IEP is "reasonably calculated to enable the child to receive educational benefits[.]" [Bd. of Educ.v.] Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). "An IEP should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." <u>Indep. Sch. Dist. No. 283 v. S.D. by J.D.</u>, 88 F.3d 556, 562 (8th Cir. 1996)(quotation omitted).

<u>Lathrop R-II v. Gray</u>, 611 F.3d 419, 424 (8th Cir. 2010).

### C. Panel's Decision

### 1. Procedural Compliance

As noted above, the Panel determined that the Parents were denied the right to meaningfully participate in the development of the Student's June 13, 2006 IEP based upon a culmination of: 1) Ms. Emery withholding information from the Parents; 2) Ms. Terrill advising Father that she was restricted by the District in what she could say; 3) The abrupt silencing of Ms. Emery at the May 26, 2006 IEP meeting and 4) Ms. Mulford's failure to disclose that she did not believe that the program being provided to the Student was appropriate. The Panel found that the multiple instances of failure to be candid negated the Parents' right to meaningful participation in the IEP process. However, when these instances are examined more closely, the Court finds that the preponderance of the evidence does not support the Panel's decision.

### a. Testimony of Ms. Emery

The Panel in their Findings of Fact focused on the testimony of Ms. Emery that she was less than candid with the Parents from April to June 2006. Ms. Emery stated that she did not withhold information from Parents; she simply withheld her opinion at times. Ms. Emery testified that she had a good relationship with the parents but disagreed with them about things, including parental follow-through. Because she wanted to maintain her relationship, she did not always choose to state what she was thinking. The Panel particularly focused on the question asked by counsel for Parents: "If you are not being honest with the whole IEP team about your thoughts and opinions about what is good for this child or what needs to be done for this child, aren't you doing a disservice to the whole IEP team, not just the Parents?" Ms. Emery responded, "Probably so." The Panel stated: "Even if good intentions prompted Ms. Emery not to be candid with Parents, the fact remains that she was not, which helped to undermine the IEP process. For Ms. Emery to minimize her failure to be candid by proclaiming that she did not withhold information just opinions appears to be rationalization as teacher's opinions are critical components of information. By her own admission, she probably did a disservice to the entire IEP team." (Panel Opinion, p. 164).

During the Administrative Hearing, Ms. Emery testified:

Q. Who were you less than candid with at the meetings in April, May and June of '06?
A. The parents.
. . .
Q. When you say you were less than honest or you weren't honest with the parents, then, let me ask you this question: Did you withhold information from them - -
A. Not - -
Q. – that might have been useful for them?
A. - - information. I withheld my opinion.
Q. And did you think your opinion would have been valuable for the IEP team and the parents to consider in June of '06 and May of '06?
A. No.

Q.  Do you think that they were entitled to your opinion about things since you were the teacher providing services to this child?

A.  My opinion at that time probably wouldn't have made a lot of difference.

Q.  Well, but you'll agree your opinion now many not make a lot of difference either, right?

. . .

A.  Probably not.

Q.  When you talked about the opinion that you didn't provide the parents - - I'm sorry. Do I gather than that you didn't express your opinions honestly in the May and June meetings that were held in '06?

. . .

A.  I didn't express my opinion.

Q.  Did you feel that you were free to give your opinion at those meetings?

A.  I was free to give them if I chose to but I chose not to because I didn't want to make problems with the parents.  I had had a good relationship with them, I didn't want to ruin that, but I did have an opinion about the behaviors.

. . .

Q.  You said you weren't honest with the parents, right?

A.  I didn't express my opinion to them.

Q.  I thought you said you weren't honest with them?  I thought that was the first term you used.

 . . .

A.  I wasn't real honest with them because I didn't really give them my opinion. We had an incident and they didn't follow through with what they had said they were going to do and I felt like, you know, that was part of the child's problem.

(Administrative Hearing Transcript, Vol. X - January 15, 2008, pp.  2378 - 2381).

On cross-examination Ms. Emery clarified her testimony:

Q.  Can you tell us why you were less than candid at times?

A.  It's kind of like you choose your words with people you have a good relationship with, and it's like if you didn't exactly agree with them but, you know, it was - - 'cause some of the things was, you know, did they follow through with what we had said to do, and, no, they didn't, and so – but I didn't say anything to them about that.  I wanted to keep our relationship good and sometimes you just don't blurt out what you feel or what you say – really think sometimes.

(Administrative Hearing Transcript, Vol. XIV, April 22, 2008, pp. 3173)

Ms. Emery also explained to the Panel that there was one particular incident

where the Student was acting up at school and Ms. Emery put her in the safe seat.

However, she refused to stay in the safe seat, so Mr. Emery took her down to a

"recovery room." When the Student still refused to calm down, Mother came across the hall, however, she did not do anything to discipline her child. Ms. Emery testified that she was annoyed that the Mother was not attempting to restrain her child who was running around the room, pulling cords out of the wall. Finally, they decided to call the Father, as per the Behavior Plan. However, Ms. Emery testified that instead of taking the Student home, the parents let her ride the bus home and then took her out to eat that evening, where she acted up again. Ms. Emery testified that she did not express to the parents her opinion that if they had followed through with their end of the Behavior Plan, that it might make an impact on the Student. This is the time that Ms. Emery was referring to when she testified that she was not being totally candid with the Parents. (Administrative Hearing Transcript, Vol. XIV, April 22, 2008, pp. 3186 -3190). However, as can be seen from reading the testimony, Ms. Emery was not being dishonest or untruthful with the parents or with the IEP team. She simply did not want to state her opinion that she thought some of the Student's behavior problems were due to the fault of the parents in failing to follow through with imposing punishment or consequences for bad behavior. This does not relate in anyway to the Student's IEP or the provision of educational services to the Student. Thus, the Court finds that the Panel erred in relying on Ms. Emery's testimony in concluding that the parents were denied meaningful participation.

**b. Ms. Terrill**

The parents did not call Ms. Terrill to testify during the Administrative Hearing. Rather, the Panel relied on the testimony of the Father regarding what Ms. Terrill told him. During the hearing the Father testified as follows:

28

Q.  Did you think in these meetings that you were being treated as an equal partner in this process?
A.  No.
Q.  Why is that?
A.  Well, there was a whole bunch of reasons, but let me put it to you this way: I know and you know, obviously, we're a little closer than most, we know a lot of stuff.  I mean, you guys think you're going to walk into a meeting and go down there and tell somebody like – I don't know, you know what, I'll just say it, Marcie Terrill.  I know that she wasn't going to speak 'cause she told me before I got in there you guys had already talked to her.

(Administrative Hearing Transcript, Vol. XVII, April 25, 2008, p. 4002).  Because Ms.

Terrill was not called to testify, the testimony is hearsay.  Additionally, it unclear exactly

what the District personnel told Ms. Terrill or why she was not going to speak out at the

IEP meetings.  The Court finds that the Panel should not have relied on this vague

hearsay in support of their decision that the parents were denied meaningful

participation.

### c.  Silencing of Ms. Emery at the May 26, 2006 IEP Meeting

The Panel also relied on the testimony of Father who testified that Ms. Emery

was touched under the table by another District employee in an effort to keep her from

speaking.  The Father testified:

And Bev, she told me, that's directly to me, and you can call me a liar, you can call her a liar, somebody's lying.  I mean, she was speaking, words were coming out of her mouth and just, pow, that was it, shut her down.  That was Brenda Williams sitting right next to her.  And it was obvious, it was obvious to me, to Rand, to anybody in that table.  These tables are smaller than this.  We was in a tight area.  I mean, somebody shut her down.  It had to be Brenda, she was sitting right next to her.  So I asked her.  And, yeah, I know, she slapped me on the  - - Brenda slapped me on the leg, you know.  And you guys – like I said, somebody is lying, it can be me, it can be her, but I'm not going to sit up here and not say something that I know to be true.  This happened and this was different because this wasn't my wife, this was me.  I was there.  I asked Ms. Emery right to her face-to-face after the meeting.  I just blew it off.  It's just more of the same.  I mean, this – how can you be equal, you know.  You know, I don't know – they're preparing before our meetings to make sure – and this is my point of view, and maybe I'm wrong 'cause you know – no, I don't think I am.  The teachers, there's certain

29

things they don't want them to say and a lot of it goes to autism because Ms. Emery, she's told me on several occasions, "Yeah, I think Brooke's got autism, too, I see it in her," but you, know, all that changed.

(Administrative Hearing Transcript, Vol. XVII, April 25, 2008, pp. 4003-4004).

However, this testimony was contradicted by Ms. Emery. Ms. Emery testified:

Q. Well, let me ask you this question: Wasn't there a point in time at one of these meetings where you were going to say something and Brenda Williams kicked you under the table and told you – basically gave you some indication not to say anything?
A. I don't remember that.
Q. Do you remember after the meeting with Mrs. Sims and telling her about the fact that you were basically silenced by Brenda Williams by her kicking you under the table when you were going to say something at the IEP meeting?
. . .
A. I don't remember that no.
 . . .
A. And, you know, I'm not saying it didn't happen. I don't remember.
Q. (By Mr. Walker) You mean that's something that could have happened that you just don't recall it now?
A. I don't remember.
Q. Was it something that frequently occurred so that you  –
A. No.
Q.  - - don't remember it happening at this meeting as opposed to some other meeting?
A. It never happened at other meetings. I don't know - - I remember there being a time when I was a little upset with some of our administrators. I remember discussing that with Mrs. Sims - -
Q. No, I'm talking about –
A. – but I don't remember being kicked and told not to say something. That, I don't remember.
Q. And you don't remember having a conversation after that meeting and telling the Sims about this; you don't remember that either?
A. No – I don't.

(Administrative Hearing Transcript, Vol. XIV, April 22, 2008, pp. 3216-3218).

The Court finds that it the Panel should not have relied on the Father's testimony

to support their conclusion that the District was forcing the teachers to keep quiet. As

can be seen from Ms. Emery's testimony, she does not ever remember such an incident

happening. Thus, the Court finds that this evidence does not support the Panel's

decision that the Parents were denied meaningful participation.

### d.  Ms. Mulford's Failure to Disclose

Nancy Mulford was a second grade teacher at Buckner Elementary.  She was a friend and colleague of Mother. Student was in Ms. Mulford's regular education classroom for 30-35 minutes per day in the 2005-2006 school year.  The Panel focused on Ms. Mulford's testimony that she believed the Student's June 2006 program at Buckner was not appropriate for Student, but she never stated that she disagreed with the program during the IEP meetings.  The Panel found this withholding was significant.

Ms. Mulford testified:

Q.  Do you think in the following year that you provided services to her, let's say June of '06, that the Fort Osage program that they had was an appropriate program for Brooke?
A.  No, I did not.
Q.  And why did you come to that conclusion?
A.  In my opinion, according to the placement she had been in was what we had normally - - or what had been mildly retarded, and I felt like Brooke was more moderate to severely retarded and she also had other handicapping conditions that made it difficult for her, her communication needs and her - - there were a lot of behavior issues that I felt were a bigger challenge or at least they were not being taken care of.

(Administrative Hearing Transcript, Vol. X, January 15, 2008, pp. 2237-38).

Ms. Mulford also testified:

Q.  And do you understand that as a member of that IEP team on any given day, you have an obligation to speak up and state your opinion at those meetings?
. . .
A.  Yes.
Q.  (By Ms. Goldman) And when you attended IEP meetings for Brooke Sims, did anyone ever tell you that you couldn't state your opinion in those meetings?
A.  No.
Q.  Did you ever say in an IEP meeting for Brooke that you disagreed with her placement while at Buckner?
A.  No.
Q.  Did you ever say at an IEP meeting for Brooke that you disagreed with the supports in the IEP?
A.  Yes.

Q. And what supports did you disagree with?
A. The language, the Mighty Mo thing that - - that they were going to provide.
Q. And you said that in the context of an IEP meeting?
A. I can't remember whether it was in the meeting or before the meeting.
Q. And why did you disagree with the Mighty Mo?
A. It was too heavy and bulky and I was first told it would not go out to recess.

(Administrative Hearing Transcript, Vol. X, January 15, 2008, pp. 2263-2264).

Ms. Mulford also testified that when she was speaking with Kristi Hinton before the

Administrative Hearing, Ms. Hinton questioned her about whether she agreed with the

Student's placement.

Q. Now, what was it, if you can recall, that you told Kristi Hinton that caused her to respond in a way as you've indicated?
A. I was asked if I agreed with Brooke's placement and I said no. When I - - when they asked me if I - - they asked me if I had spoken up in IEP meetings and I said - - I said no. And that's when she said I could be held morally - - she said, "You could be liable or held morally or ethically responsible."
Q. Now, did that cause you some concern about testifying in this case?
A. Yes.

(Administrative Hearing Transcript, Vol. X, January 15, 2008, pp. 2231-2232 ).

On cross-examination, Ms. Mulford clarified her testimony:

Q. When - - you've testified that Kristi Hinton told you in that meeting, that you don't recall the date of, that you could be held morally or ethically liable; is that correct?
A. She said liable and then she said morally or ethically responsible.
Q. And do you recall that that was said in relation to Ms. Hinton telling you that if you had a prior disagreement with the team you should have spoken up about that?
A. Yes.
Q. And she didn't threaten your job, did she?
A. No.
Q. And, in fact, Ms. Hinton told you you should come in here and tell the truth, is that also correct?
A. I don't remember her saying that but that doesn't mean she didn't.

(Administrative Hearing Transcript, Vol. X, January 15, 2008, p. 2275). The Panel

found that Ms. Mulford's failure to disclose was one of multiple instances of failure to be

candid. However, when closely examined, Ms. Mulford stated that there were a couple

32

of areas that she did not agree with - such as communication and how behavior issues were being dealt with.  But, Ms. Mulford admitted that she only had the Student for thirty-five minutes per day for story time and that Ms. Emery was in a much better position to discuss Student's educational program, because she was the teacher who the Student spent the majority of her day with.  The Court does not find that this testimony supports a conclusion that Ms. Mulford was withholding important information from the Parents.  Thus, the Court does not find that this supports a conclusion that the parents were denied meaningful participation in the IEP process.

The School District argues that the Panel's decision must be reversed because the findings of fact were not based on substantial and competent evidence in the record. The District also believes that the Panel applied an erroneous legal standard - "complete candor" which has no support in statute, regulation or caselaw.

The Parents argue that they were denied an opportunity to meaningfully participate because the School predetermined placement for the Student before the IEP was completed.

The Court agrees with the School District that the Administrative Panel's Findings of Fact are not based on substantial and competent evidence. As discussed above, when closely examined, the evidence does not support the Panel's conclusion that members of the IEP either withheld information from the Parents or that the District was actively trying to suppress information.  The District argues that the Parents cannot raise the predetermination issue at this stage of the proceedings because they did not raise it during the Administrative Hearing.  "The IDEA requires that the plaintiffs exhaust their administrative remedies before proceeding to federal court. . . . Certain exceptions

apply to this rule, such as futility and lack of adequate relief, none of which are argued

to apply in this case." O'Dell v. Special Sch. Dist. of St. Louis County, 503 F.Supp.2d

1206 (E.D.Mo. 2007)(internal citations omitted).  However, even if the Parents had

raised this issue, the Court finds no support for this argument.  In Nack ex. rel. Nack v.

Orange City Sch. Dist., 454 F.3d 604 (6th Cir. 2006), the Court stated:


> Predetermination amounts to a procedural violation of the IDEA. . . . It can
> cause substantive harm, and therefore deprive a child of a FAPE, where
> parents are effectively deprived of meaningful participation in the IEP
> process. . . . However, predetermination is not synonymous with
> preparation.  Federal law prohibits a completed IEP from being presented
> at the IEP Team meeting or being otherwise forced on the parents, but
> states that school evaluators may prepare reports and come with pre-
> formed opinions regarding the best course of action for the child as long
> as they are willing to listen to the parents and parents have the opportunity
> to make objections and suggestions.

Id. at 610 (internal citations and quotations omitted).  In the instant case, there is no

indication or suggestion that the IEP team was not willing to listen or work with the

Parents.  Therefore, even if this issue had been administratively exhausted, the Court

finds no support for this claim in the record.

The Administrative Panel itself noted that the Parents in this case had:

> extensive input into virtually all (they missed only one IEP meeting) of their
> daughter's IEPs, including the June 13, 2006 IEP.  Not only did the
> Parents actively participate, but those that they invited, including their
> experts and advocate, also actively participated, and often, as a result of
> that participation, numerous components of the IEPs including present
> level of performance, goals and objectives, modifications and adaptations
> were changed.  The District spent an inordinate amount of time and
> manpower to accommodate Parents and their representatives' positions
> and in the development of Student's IEPs. . . . In addition, the District
> expended considerable resources in preparing for the IEPs and for testing
> that was considered in developing Student's IEPs.  The number of
> meetings and hours devoted by District's staff to Student is overwhelming.

Therefore, the Court finds that the Panel's decision regarding procedural compliance is not supported by a preponderance of the evidence, and the Parents were not denied meaningful participation in the IEP process. Accordingly, the Court hereby **REVERSES** the portion of the Panel's decision finding that the District did not procedurally comply with the IDEA.

### 2. Substantive Compliance

> An educational agency provides a FAPE when it complies with IDEA procedures and offers an educational program reasonably calculated to enable the child to receive educational benefits. . . . Accordingly, IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense. . . . Rather, IDEA is satisfied when the educational agency provides individualized education and services sufficient to provide the disabled child with some educational benefit.

C.B. v. Special School Dist. No.1, 641 F.Supp.2d 850, 855 (D.Minn. 2009)(internal citations and quotations omitted). "[A] school is required only to formulate an IEP tailored to the disabled child's needs that is reasonably calculated to enable the child to receive educational benefits." Lathrop R-II, 2009 WL 2982645 at *8 (internal citations and quotations omitted).

The Panel determined that it was advisable, although not necessary, to indicate their rulings on whether there was substantive compliance of the June 13, 2006 IEP as written. A two member majority of the Panel concluded that the June 13, 2006 IEP was substantively compliant. One panel member disagreed with these findings. The Panel also agreed that the April 2, 2007 IEP was appropriate and would have provided a FAPE to Student. The Panel found that the taint of non-disclosure had been removed because Ms. Emery testified that her lack of candor was in April, May and June 2006.

Additionally, Ms. Terrill and Ms. Mulford were no longer participants in the Student's education. The Panel also determined that it was of no legal consequence whether or not the student had autism as the District addressed her specific needs.

The Parents argue that the School failed to properly evaluate the Student's disabilities and failed to craft an IEP that was calculated to meet those needs. The Parents argue that none of the goals or objectives contained or referenced their respective starting points and without this information determining the efficacy of the goals or objectives was left to speculation. The Parents also argue that there was a lack of meaningful progress, lack of measurable goals and objectives and a failure to develop a plan that addressed the Student's behaviors and objectives. In Lathrop R-II School Dist. v. Gray, the Court rejected the argument that an IEP is procedurally flawed because it did not include baseline data. The Court stated:

> [t]he IDEA does not explicitly mandate such specific data, however. What it does require is a statement of the child's present level of educational performance, including how the child's disability affects the child's involvement and progress in the general curriculum[,] an a statement of measurable annual goals, including benchmarks or short-term objectives[.]

Id. 611 F.3d at 424 (internal citations and quotations omitted). In the instant case, the Student's IEPs all contained a very lengthy present level of her educational performance to date, as well as a statement as to how her disability affected her involvement and progress in the general curriculum. See School's Exhibit's R-37, pp. 480-503 (May 24, 2005 IEP); R-44, pp. 523-71 (October 18, 2005 IEP) ; R-46, pp. 583-84 (February 10, 2006 IEP Addendum) and R-58, pp. 623-57 (June 13, 2006 IEP). The IEPs also contained several measurable annual goals and included benchmarks designed to assess whether the Student was making progress toward the goals and if it was expected that the goals would or would not be achieved. Therefore, the Court finds

that the preponderance of the evidence supports the Panel's decision that both the June 13, 2006 and the April 2, 2007 IEPs were reasonably calculated to enable the Student to receive educational benefits.

### 3. Propriety of Rainbow Center as Placement/Reimbursement

The Panel found that Rainbow Center was an appropriate placement and that the parents were entitled to reimbursement for one year's tuition. Because the Court finds that the District procedurally complied with the statute and because the Panel found that the IEP's were substantively compliant, then the District would have been able to provide Student a FAPE had she remained in the District. Therefore, because the District would have been able to provide Student a FAPE the Court finds that parents are not entitled to reimbursement from the District.

### IV. CONCLUSION

The Court hereby **AFFIRMS IN PART** and **REVERSES IN PART** the Panel's decision.

The Court **REVERSES** that portion of the Panel's opinion finding that the Parent's were denied meaningful participation in the IEP process and that Student was denied a FAPE for the 2006-2007 school year. The Court also reverses the Panel's decision finding the Rainbow Center to be an appropriate placement and awarding reimbursement to parents for the tuition paid in the 2006-2007 school year.

The Court **AFFIRMS** that portion of the Panel's opinion which finds that the June 13, 2006 and April 2, 2007 IEPs were substantively compliant with the IDEA.

The Court hereby **GRANTS** the District's Motion for Judgment on the Administrative Record or in the Alternative for Summary Judgment on Plaintiff's Complaint (Doc. # 19) and the District's Motion for Judgment on the Administrative

Record or in the Alternative for Summary Judgment on the Sims' Counterclaim

Complaint (Doc. # 21) and **DENIES** the Sims' Motion for Judgment on the

Administrative Record (Doc. # 24).


Date:___09/30/10_____          **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri          Fernando J. Gaitan, Jr.
                               Chief United States District Judge